## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK SCHOTTE, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br> v.<br><br>THE STOP & SHOP SUPERMARKET COMPANY, LLC,<br><br>     Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Mark Schotte ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant The Stop & Shop Supermarket Company, LLC ("Defendant" or "Stop & Shop"). Plaintiff makes the following allegations based upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including the investigation conducted by his attorneys.

### NATURE OF THE ACTION

1. This is a putative class action lawsuit on behalf of purchasers of Defendant's Stop & Shop-branded and Always My Baby-branded flushable cleansing wipe products (collectively, the "Wipes"). Defendant markets and sells the Wipes as "flushable" wipe products. In fact, the Wipes are not flushable, in that they do not break apart or disperse in a reasonable period of time after flushing, resulting in clogs or other sewage damage.

2. Flushable wipes are a personal hygiene product that serve as an alternative to toilet paper. Flushable wipes are generally packaged as small to medium-sized moistened pieces of cloth, which come pre-cut into rectangles, folded, and wrapped for convenience. The flushable

1

wipe industry is growing at twice the rate of all other restroom wipe products.  For example, in 2018, flushable wipes accounted for $2.1 billion in total sales.

3.      Consumers understand that "flushable" is commonly defined and understood to mean suitable for disposal by flushing down a toilet.  As a result, reasonable consumers expect that "flushable wipe" products will disperse in a short amount of time after flushing and therefore will not clog or cause other operational problems in household sewage lines, septic systems, and other standard wastewater equipment.  To be suitable for flushing, any "flushable" product must be able to quickly disintegrate into small pieces such that it can pass through sewer systems without issue.

4.      Contrary to Defendant's representations, the Wipes are not, in fact, flushable.  The Wipes do not break apart or disperse after flushing.

5.      As such, Defendant engaged in widespread false and deceptive advertising on its the Wipes by claiming the Wipes are "flushable" (the "Flushability Claims").  Every package of the Wipes prominently claims that the product consists of "flushable" Wipes.

6.      Plaintiff and Class Members purchased defective flushable wipes designed, marketed manufactured, distributed, and sold by Defendant as "flushable."  Further, Plaintiff and Class Members relied to their detriment on Defendant's representation that the Wipes are "flushable."  Plaintiff and Class Members would not have paid to purchase Defendant's Wipes – or would not have paid as much as they did to purchase them – had they known that they are not, in fact, "flushable."  Plaintiff and Class Members thus suffered monetary damages as a result of Defendant's deceptive and false representations.

7.      The mislabeling of the Wipes renders the products completely worthless.  There is no value to consumers for purportedly "flushable" wipes that are not actually flushable.

Nevertheless, the Wipes are labeled and sold as an alternative to toilet paper, and they command a significant price premium over non-flushable wipes and traditional toilet paper. Thus, Plaintiff and Class Members have been hit with a costly double-whammy: a premium purchase price for a worthless product.

## **PARTIES**

8.      Plaintiff Mark Schotte is a citizen of Massachusetts, residing in Beverly, Massachusetts. In or around February of 2023, Plaintiff Schotte purchased the Wipes for his personal use from a Stop & Shop grocery store located at 224 Elliott Street, Beverly, MA 01915. Prior to his purchase of the Wipes, Plaintiff Schotte reviewed the product's labeling and packaging and saw that the Wipes were purportedly "flushable" on the front panel. Plaintiff Schotte relied on that representation to choose the Wipes over comparable products. Plaintiff Schotte saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that the Wipes were "flushable." Plaintiff did not realize the side or back panel of the Wipes contained small-print information inconsistent with this representation. Plaintiff Schotte relied on the representations and warranties that his products were "flushable" in deciding to purchase his Wipes. Accordingly, these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Wipes on the same terms had he known these representations were not true. However, Plaintiff Schotte remains interested in purchasing flushable wipes and would consider the Wipes in the future if Defendant ensured the Wipes were actually flushable. In making his purchase, Plaintiff Schotte paid a substantial price premium due to the false and misleading Flushability Claims. However, Plaintiff Schotte did not receive the benefit of his bargain because his Wipes, in fact, were not flushable. Plaintiff Schotte further

understood that the purchase came with Defendant's representation and warranties that the Wipes were "flushable."

9.      Defendant The Stop & Shop Supermarket Company, LLC is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business in Quincy, Massachusetts.   The Stop & Shop Supermarket Company, LLC manufactures, sells, and/or distributes Stop & Shop-branded and Always My Baby-branded products, and is responsible for the advertising, marketing, trade dress, and packaging of the Wipes.  Stop & Shop manufactured, marketed, and sold the Wipes during the class period.  The planning and execution of the advertising, marketing, labeling, packaging, testing, and corporate operations concerning the Wipes and the Flushability Claims was primarily carried out at Stop & Shop's headquarters and facilities within Massachusetts.   The policies, practices, acts and omissions giving rise to this action were developed in, and emanated from, Stop & Shop's headquarters in Quincy, Massachusetts.

## JURISDICTION AND VENUE

10.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from Defendant, the amount in controversy exceeds $5 million, exclusive of interest and costs, and the proposed class contains more than 100 members.

11.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

12.      This Court has general personal jurisdiction over Defendant because it is headquartered and maintains its principal place of business in this District.

## FACTUAL ALLEGATIONS

### A.    Defendant's Misrepresentations Regarding The Wipes

13.    The Wipes are sold in a variety of fragrances and packaging.  But, on the front of

the Wipes' packaging, for both its Stop & Shop-branded and Always My Baby-branded Wipes,

Defendant uniformly represents that the Wipes are "flushable" in bold, prominent font:









14.     In addition, the underside of each of the Wipes' packaging contains the same small print, purported disclaimer:

**Stop & Shop disclaimer:**



**Always My Baby disclaimer:**



15.    But no reasonable consumer would even notice the disclaimer, which is located on the underside of the packaging, in small print, and is hidden by a tab that must be folded up to even view it:









16.     Further, no reasonable consumer would expect that small print language on the

side or back panels of the Wipe products would contain language inconsistent with the

representation that the Wipes are "flushable."  Nor would a reasonable consumer expect that a "flushable" wipe would not break down in a timely manner under ordinary circumstances, such as when placed in water.  No reasonable consumer would even notice the disclaimer at all, given its location, print size, and color. And the disclaimer is vague to the point of uselessness because the Wipes should not be flushed at all.

17.     Defendant's advertising and marketing of the Wipes is false and misleading and omits material information.  The Wipes prominently advertise on the front label that they are "flushable."  Consumers reasonably expect that the Wipes will, in fact, be "flushable" and therefore are safe for home use.  Nowhere on the Wipes' packaging does Defendant inform consumers that the Wipes are not suitable for flushing.  Defendant's misrepresentations and/or omissions violate consumers' reasonable expectations and, as alleged herein, Massachusetts' consumer protection statutes.

### B.     Defendant's Wipes Are Not "Flushable"

18.     Historically, toilet paper has been considered the benchmark for flushability because it begins to break down upon contact with water.  Toilet paper will disintegrate into small pieces suitable for passing through sewer and septic systems without causing clogs.  In contrast, "flushable" wipes – like Defendant's – do not perform as advertised or marketed. Flushable wipes do not disintegrate effectively and can commingle to cause clogs and other sewage line issues.  As stated by industry officials, "[f]lushable wipes are not truly flushable …. They might go down the drain, but they do not breakup like regular toilet paper."[1]

19.     A product labeled "flushable" must break apart or disperse in a reasonable period

---

[1] New York Times, *Americans Coping with the Coronavirus are Clogging Toilets* (Mar. 21, 2020), available at: https://www.nytimes.com/2020/03/21/us/flushable-wipes-clog.html (last accessed Mar. 17, 2023).

of time such that it can clear sewage systems without causing clogs or otherwise negatively

impacting sewage lines.  However, Defendant's Wipes do not break apart or disperse in a

reasonable period of time, resulting in clogs or other sewage damage.

20.     Indeed, studies highlight the nature of the mislabeling of flushable wipe products

like the Wipes.  For example, in *Defining 'Flushabiliy' for Sewer Use* by Anum Khan et al.

("*Defining 'Flushability'*") researchers at Ryerson University in Toronto tested 101 consumer

products, including 23 wipes labeled as "flushable," and found that "most products tested for

drainline clearance did not clear the drainline in a single flush, sometimes requiring up to six 6-L

flushes ….  Therefore, a consumer product is potentially incompatible with toilets and plumbing

systems."[2]  Further, while "all bathroom tissue tested fully disintegrated before the end of the 30-

minute agitation period … none of the products labelled 'flushable' disintegrated within the

allotted time to an extent required to pass the test."[3]  As a result, they determined "it is evident

that none of the products other than bathroom tissue are 'flushable.'"[4]

21.     Further, the National Association of Clean Water Agencies ("NACWA")

conducted a nationwide study addressing the cost of wipes in 2019, working closely with other

national and state organizations.[5]  The study was designed to provide conservative estimates of

the likely cost of wipes in the United States at both the national and state levels, and is based on

data collected from 25 utilities in 19 states, broadly representative of the population of utilities in

---

[2]Defining 'Flushability' for Sewer Use, Ryerson University, Final Report by Anum Kan et al. (Mar. 31, 2019), available at https://www.ryerson.ca/content/dam/water/Research/FinalReport-FlushablesApril1.pdf (last accessed Mar. 17, 2023).

[3] *Id.*

[4] *Id.*

[5] NACWA, The Cost of Wipes On America's Clean Water Utilities, https://www.nacwa.org/docs/default-source/resources---public/govaff-3-cost_of_wipes-1.pdf?sfvrsn=b535fe61_2 (last accessed Mar. 17, 2023).

the United States.  Ultimately, NACWA estimates that wipes result in about $441 million per

year in additional operating costs in the collection systems of clean water utilities in the U.S. and

impose over $30,000 in additional collection system operating costs on the average utility per

year.  In some states, such as California and New Jersey, with relatively few utilities and high

flows, the average utility pays significantly more.

22.    Numerous independent tests demonstrate and confirm that wipes labeled and sold

as being "flushable" will not break down or dissolve in any sewer system.

23.    Consumer Reports performed independent disintegration tests on flushable wipes

that simulated toilet flushing conditions.  A video clip depicting the tests shows that toilet paper

broke down in about eight seconds, but after ten minutes, the flushable wipes did not break

down, and still did not break down after being placed in a Kitchen Aid mixer for another ten

minutes.[6]  The video concludes: "Our advice: If you use these products, don't flush them down

the toilet."[7]

24.    In 2016, the City of Vancouver, Washington conducted a series of "in-sewer"

tests of allegedly "flushable" wipes, dropping them into a manhole and observing their

conditions at a downstream collection point.  The study concluded that nearly all flushable wipes

currently on the market in the United States "cannot be considered safe to flush since they travel

through real sewers intact, with no dispersion."[8]  The test found flushable wipes completely or

---

[6] Consumer Reports, Think twice about flushing wet wipes (Dec. 27, 2013), available at:
https://www.consumerreports.org/cro/news/2013/12/think-twice-about-flushing-
wetwipes/index.htm (last accessed Mar. 17, 2023).

[7] Eyewitness News, Consumer Reports: Flushable Wipes, available at:
https://abc7ny.com/consumer-reports-plumbing-flushable-wipes-eyewitness-news/29868/ (last
accessed Mar. 17, 2023).

[8] *See* Testimony of Cynthia A. Finley, Ph.D., Summary of Field Dispersion Tests, Attachment B
at 9 (Mar. 15, 2017), available at: https://www.nacwa.org/docs/default-source/resources---
public/2017-03-15mdemtest.pdf?sfvrsn=4 (last visited Apr. 3, 2023).

nearly completely intact.[9]

25.      In a video posted by the Water Environment Federation, pretreatment technician Tracy Stevens performed a "spin test" on multiple household products, including: one ply tissue, three ply tissue, regular toilet paper, plush toilet paper and multiple brands of flushable wipes.[10] The products were placed in beakers filled with water and a spinning blade to simulate flushing, and only toilet paper dispersed almost immediately.[11]  After a few minutes, the flushable wipes were still completely intact, with some cloudiness in the beaker that was attributed to lotion on the wipe.[12] According to Stevens:

> If you define flushable as yes it will go down the toilet, then [ ]
> everything [tested] here is flushable. If you define it as whether it
> will make it to the treatment plant, then [ ] all of these things could
> eventually make it to the treatment plant and maybe one time out of
> ten, or one time out of twenty they don't, and with hundreds of
> thousands of people out there flushing these things down one out of
> ten, one out of a hundred, one out of a thousand, they are going to
> cause trouble.[13]

26.      CBS4 Miami, after investigating damage caused by flushable wipes, hired I-P-S testing, the only independent testing facility in the country, to conduct a slosh box test. I-P-S put toilet paper, flushable wipes, and non-flushable wipes through the same slosh box test.  After one hour, the toilet paper was barely visible, but the flushable wipes and non-flushable wipes were fully intact.  After two hours, the toilet paper had dispersed completely, the flushable wipes had "shredded some, but visible chunks still remain[ed]" and the non-flushable wipes had not

---

[9] *Id.* at 11-12.

[10] Water Environment Federation, Will it Flush? Video, YOUTUBE (Jan. 4, 2012), available at: http://www.youtube.com/watch?v=SLTVqkXVvNk&feature=youtu.be (last visited Mar. 17, 2023)

[11] *See id.*

[12] *See id.*

[13] *See id.*

changed at all.  After three hours, there was "a trace amount" left of the flushable wipes and the non-flushable wipes remained "pretty intact."[14]

27.     These problems are, or should be, known to Defendant.  Yet, Defendant continues to market and sell the Wipes as "flushable" wipes, and does so at a higher cost than its own non-flushable wipes.  For example, "Always My Baby Thick & Gentle Baby Wipes Scented" wet wipes sold by Defendant cost approximately $0.04 per wipe while "Always My Baby Toddler Wipes Melonberry Flushable Wipes" and "Stop & Shop Flushable Cleansing Wipes Fresh Scent" both cost approximately $0.05 per wipe.



[15]

---

[14] CBS 4 Miami, The Trouble With Wipes In Your Pipes (Feb. 4, 2014), available at: http://miami.cbslocal.com/2014/02/04/the-trouble-with-wipes-in-your-pipes/ (last visited Mar. 17, 2023).

[15] https://stopandshop.com/product/always-my-baby-thick-gentle-baby-wipes-scented-72-ct-pkg/225122 (last visited Mar. 17, 2023).



16

17

Thus, Plaintiff and members of the Class and Subclass paid, at minimum, ***twenty-five percent***

more for the flushable Wipes due to the Flushability Claims.

---

[16] https://stopandshop.com/product/always-my-baby-toddler-wipes-melonberry-flushable-50-ct-pkg/215777 (last visited Mar. 17, 2023).

[17] https://stopandshop.com/product/stop-shop-flushable-cleansing-wipes-fresh-scent-50-ct-ea-2-pk-100-ct-pkg/222474 (last visited Mar. 17, 2023).

28.     Had Defendant not made the false, misleading, and deceptive representations and/or omissions alleged herein, Plaintiff and Class Members would not have purchased the Wipes or would not have paid as much as they did for such products.  Thus, Plaintiff and each Class Member suffered an injury in fact and lost money or property as result of Defendant's wrongful conduct.

## CLASS ALLEGATIONS

29.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Wipes during the applicable statute of limitations period (the "Class").  Excluded from the Class are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators, and anyone who purchased the Wipes for resale.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

30.     Plaintiff Schlotte also seeks to represent a subclass of all Class Members who purchased the Wipes in Massachusetts during the applicable statute of limitations period (the "Massachusetts Subclass").

31.     Collectively, the Nationwide Class and the Subclass are referred to as the "Classes."

32.     Plaintiff reserves the right to expand, limit, modify, or amend the class definitions, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based on, inter alia, changing circumstances and new facts obtained.

33.     **Numerosity**. The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed

members are unknown to Plaintiff, the true numbers of members of the Classes are known by Defendant.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

34.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.   These common legal and factual questions include, but are not limited to, the following:

(a)     whether Defendant misrepresented and/or failed to disclose material facts concerning the Wipes;

(b)     whether Defendant's conduct was unfair and/or deceptive;

(c)     whether Defendant's conduct violates the statutes referenced herein; and

(d)     whether Plaintiff and the Classes sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

35.     **Typicality.**  Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendant's Wipes, and Plaintiff sustained damages from Defendant's wrongful conduct.

36.     **Adequacy of Representation.**   Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

37.     **Superiority.**  The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may

lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefit of single adjudication, economies of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims are before this Court for consistent adjudication of liability issues.

## CAUSES OF ACTION

### COUNT I
**Violation of the Massachusetts Unfair and Deceptive Business Practices Act,
Mass. Gen. Laws Ch. 93A *et seq.*
(On behalf of the Classes)**

38.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

39.    Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

40.    Section 2 of Chapter 93—the Massachusetts Unfair and Deceptive Business Practices Act ("MUDBPA")—prevents the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce." An act is "deceptive" under Chapter 93A "if it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991).

41.    It is "the intent of the legislature that in construing" whether an act is deceptive under 93A § 2, "the courts will be guided by the interpretations given by the Federal Trade

Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended." *See* Mass. Gen. Laws Ann. ch. 93A, § 2.

42.     Section 9 provides: "Any person … who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two … may bring an action in the superior court … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper … Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons." *Id.* § 9.

43.     Pursuant to the definitions codified at Chapter 93A § 1, Defendant is a "person," and Defendant is engaged in "trade" and "commerce" in Massachusetts by offering for sale the Wipes that directly or indirectly affect the people of Massachusetts, and because Defendant resides in Massachusetts and the acts and omissions alleged above and incorporated herein originated from Massachusetts.

44.     By engaging in the acts and omissions alleged above and incorporated herein, Defendant has engaged and continues to engage in unfair or deceptive acts or practices in the conduct of trade or commerce.

45.     Defendant's misrepresentations deceive and have a tendency to deceive a reasonable consumer and the general public.

46.     Defendant's acts and omissions are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

47.    Plaintiff and members of the Classes reasonably relied upon and were deceived by Defendant's affirmative statements when they purchased the Wipes.

48.    Defendant knowingly mispresented that the Wipes were "flushable" at the time of sale and at all relevant times thereafter.

49.    Had Plaintiff and members of the Classes known that the Wipes were not "flushable" as reasonable consumers understand the term, they would either not have purchased the Wipes, or would have paid less for them than they did.

50.    Defendant's misconduct caused Plaintiff and members of the Classes to suffer an injury, adverse consequence, or loss because (a) they would not have purchased the Wipes on the same terms if the true facts were known about the product; (b) they paid a price premium for Wipes due to Defendant's promises that they were "flushable"; and (c) the Wipes did not have the characteristics promised by Defendant.

51.    Plaintiff and members of the Classes have been harmed by this injury, adverse consequence, and/or loss.

52.    The MUDBPA represents a fundamental public policy of the Commonwealth of Massachusetts.

53.    For each loss, Plaintiff and each member of the Classes may recover an award of actual damages or twenty-five dollars, whichever is greater.  Ch. 93A § 9(3).

54.    Because Defendant acted willfully or knowingly, Plaintiff and each member of the Classes may recover up to three but not less than two times this amount.  In addition, Plaintiff may recover attorneys' fees and costs.

55.    Plaintiff and the members of the Classes may also seek the imposition of injunctive relief which limits and polices Defendant's representations within or reaching Massachusetts. The

balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Classes, and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff, members of the Classes, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is capable of repetition or re-occurrence absent the entry of a permanent injunction.

56.     In accordance with Mass. Gen. Laws Ch. 93A, § 9(3), on March 6, 2023, Plaintiff's counsel served Defendant with written notice of its violation of Ch. 93A and a demand for relief. A true and correct copy of the letter is attached hereto as **Exhibit 1**. Defendant did not make a written tender of settlement for the putative class in response.

<u>**COUNT II**</u>
**Breach of Express Warranty**
**(On behalf of the Classes)**

57.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

58.     Plaintiff brings this claim individually and on behalf of the Members of the proposed Classes against Defendant.

59.     As the designer, manufacturer, marketer, distributor, and/or seller of the Wipes, Defendant issued an express warranty by representing to consumers at the point of purchase that the Wipes were flushable. Defendant's representations were part of the description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiff and Members of the Class and Subclass.

60.     In fact, the Wipes do not conform to Defendant's representations about "flushability" because the Wipes are not flushable. By falsely representing the Wipes in this way, Defendant breached express warranties.

61.     As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Classes were injured because they: (1) paid money for the Wipes that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the Wipes they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Wipes they purchased had less value than Defendant represented.  Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiff and Class and Subclass Members would not have purchased the Wipes or would not have paid as much as they did for them.

62.     On or around March 6, 2023, prior to filing this action, Defendant was served via certified mail with a pre-suit notice letter on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiff's counsel sent Defendant a letter advising that Defendant breached an express warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **Exhibit 1**.

**<u>COUNT III</u>**
**Breach of Implied Warranty**
**(On Behalf Of The Classes)**

63.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

64.     Plaintiff brings this claim individually and on behalf of the Members of the proposed Classes against Defendant.

65.     Defendant routinely engages in the manufacture, distribution, and/or sale of the Wipes and is a merchant that deals in such goods or otherwise holds themselves out as having knowledge or skill particular to the practices and goods involved.

66.     Plaintiff and Members of the Class and Subclasses were consumers who purchased Defendant's Wipes for the ordinary purpose of such products.

67.     By representing that the Wipes would be flushable, Defendant impliedly warranted to consumers that the Wipes were merchantable, such that they were of the same average grade, quality, and value as similar goods sold under similar circumstances.

68.     However, the Wipes were not of the same average grade, quality, and value as similar goods sold under similar circumstances.  Thus, they were not merchantable and, as such, would not pass without objection in the trade or industry under the contract description.

69.     As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class and Subclasses were injured because they paid money for the Wipes that would not pass without objection in the trade or industry under the contract description.

**COUNT IV**
**Unjust Enrichment**
**(On behalf of the Classes)**

70.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above as though fully set forth herein.

71.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

72.     Plaintiff and members of the Classes conferred a benefit in the form of monies paid on Defendant by purchasing the Wipes.

73.     Defendant voluntarily accepted and retained this benefit.

74.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for the deceptively marketed Wipes, it would be unjust and inequitable for the Defendant to retain it without paying the value thereof.

75.     As a direct and proximate result of Defendant's actions, Plaintiff and Class members have suffered damages in an amount to be proven at trial.

## COUNT V
### Fraud
### (On behalf of the Classes)

76.     Plaintiff incorporates by reference and re-allege each and every allegation set forth above as though fully set forth herein.

77.     Plaintiff brings this claim individually and on behalf of the members of the Classes against Defendant.

78.     As discussed above, Defendant provided Plaintiff and members of the Classes with false or misleading material information about the Wipes, including but not limited to the fact that the Wipes were "Flushable."

79.     These misrepresentations were made with knowledge of their falsehood.

80.     Further, Defendant attempts to escape liability with small and ambiguous disclaimers that Defendant knows will confuse Plaintiff and members of the class.

81.     The misrepresentations made by Defendant, upon which Plaintiff and members of the Classes reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and members of the Classes to purchase the Wipes.

82.     The fraudulent actions of Defendant caused damage to Plaintiff and members of the Classes, who are entitled to actual losses and damages in a sum to be determined at trial, including other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendant as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel;

(b)     For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: April 26, 2023                          Respectfully submitted,

**REARDON SCANLON LLP**

By: */s/ James J. Reardon, Jr.*
        James J. Reardon, Jr.

James J. Reardon, Jr. (BBO #566161)
45 South Main Street, 3rd Floor
West Hartford, CT  06107
Telephone: (860) 955-9455
Facsimile:  (860) 920-5242
Email:  james.reardon@reardonscanlon.com

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (*pro hac vice* forthcoming)

Matthew A. Girardi (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: fklorczyk @bursor.com


*Attorneys for Plaintiff*